All right, the last case of this morning is the case of Martinez v. Quick 236001 and we'll hear from Mr. Van Winkle. When the state seeks a death penalty, child counsel have a duty to investigate all of the recently available mitigating evidence. Counsel are also required to follow up on leads that are readily identifiable. As this court has recognized, investigating the family is the starting point for most investigation. But Martinez's counsel did not make it past that starting point and they failed to adequately investigate Mr. Martinez's mother, Roberta, grandfather, Marty, and Uncle Richard. Should the scope of the investigation include members of the defense team, including Ms. Villanova and Mr. Villas? I think a lot of the time we could probably assume that what the defense team does, child counsel is aware of. But I think in this particular case, it's clear that they were not aware of it. And I think we get that directly from the trial transcript. And I want to be clear that we're raising a failure to investigate claim and the evidence of that failure to investigate is obvious from the transcript. Now, why do you think that defense counsel was unaware, he was certainly aware when Ms. Villanova testified about her conversations with 12 people, including when your co-counsel cross-examined Ms. Villanova, I think on page 46, about the particular 12 people that she included, which included Marty and Roberta. And you know that at least Ms. Villanova had talked also to the uncle, Richard. And these are the only three individuals you referred to because your own affidavit, Exhibit 5, referred to Richard saying that he had gotten a call from Norma, which is obviously Norma Villanova. So why do you think we should rely on your statement that defense counsel was unaware of these memos in the file about the conversations or what his own expert witness, Ms. Villanova, had said about her conversations with all three of those individuals? Well, I think it's based on the transcript. And what trial counsel did is they presented an intoxication offense, a defense that's not very sympathetic to jurors, and so they made the decision to present it in absolute terms. This guy's been in Trump for half his life. He's drank nearly every day since he was 13. And in the face of the family witnesses getting ready to come on, and those family witnesses would testify to something far below that, which both of them are incorrect in that situation. But basically, trial counsel, they either read the investigative memos and then presented this voluntary intoxication offense, absolute, every day, half his life. And they did that in the face of these witnesses who they knew were going to come on, who had been on the state's witness list for two years, and described what they were going to testify to. So either they chose to just go the opposite of what the state's witnesses were going to do, or they hadn't read it, and they presented the voluntary intoxication offense. And I think it's most likely the former, and I think we see this because once trial counsel were essentially caught, they'd get up in front of the jury, and they'd say, well, take it or leave it, maybe not. I think if you just... Well, that's not what they said, take it or leave it, maybe not. That's not what you were getting at. That's not exactly what they said, but I think from the transcript, you get the feeling of what happened in the courtroom. So counsel, an opening statement, they said that from about the age of 13, Marquinhos was an alcoholic, and that he continued drinking from the age of 13 until this case. Dr. Price, the first expert, said Mr. Martinez started at a young age, and he drank a lot, and drank to intoxication almost every day for over 15 years. That's exactly what Mr. Martinez told Dr. Price. Well, we know from Rampilla, you have to do more than just accept what your client says. And Dr. Price, not only did he tell him that, but Dr. Price did neuropsych testing, and that came back with mental impairments, and auditory processing, memory, and executive functioning. And he's an alcoholic. They're not great witnesses for themselves. And that's why Rampilla tells us, you've got to do more than just listen to your client. You've got to go out and talk to the family. And this... I know the brief spends 20 pages about the ABA guidelines and the importance of the family. This court in Cole did it in about two sentences. The family's important. You've got to talk to them. Well, the ABA guidelines also specifically says that a defense counsel in a capital case should rely on his or her team of investigators, doesn't it? It does, but we don't think they did that. Well, we know that you did it. I mean, we know that John Millis talked to two of the individuals. We know that Norma Villanova talked to all three. Millis talked to Marty twice, talked to Roberta, got all of the information from Kathy Sova, et cetera, about Roberta dropping off the child, et cetera. So we know that defense counsel complied with the ABA guidelines and relying on the team. I think what you're trying to tell us is that the defense lawyer didn't do a very good job of presenting witnesses consistent with the information that he had gleaned from the investigation. Is that fair? Well, I think it's both. I think from the investigative memos you can see that some people had talked to them, but I think from the trial presentation it's clear that trial counsel were unaware of this. Well, you said it a couple times. You said it was obvious that the trial defense counsel did not even know their investigator or their mitigation specialist had interviewed these witnesses. You said it was obvious from the transcript. But there's an affidavit from trial defense counsel Harry Hudson. I don't recall him saying that in the affidavit. Is there any evidence that we have in this record that tells us that it's, again, obvious or clear that the lawyers didn't even know that the investigator or their mitigation specialist had spoken to these witnesses? Well, maybe I overspoke there. I think they could maybe know they had done it, but the substance of it, they clearly were not aware of the substance of what they had said because they presented it in such opposite terms. And just to continue on with earlier, the second expert, Mr. Martinez, drinking very heavily and continuously from the ages of 15 through 29. He has no doubt. And then the third expert, Villanova, she doesn't even agree with that. Martinez had a drinking problem but was not drinking every day in high school. This is just from her own three experts. They should have realized that this defense was more nuanced. But still they presented it in absolute terms and made it very easy for the state to undermine it. Did you present any of this argument in your OCCA application? The argument presented in the OCC was I, Steve Strickland, with the family, those four members, and now we have three. But you didn't, is it fair to say you did not say one word in your post-conviction application with OCCA about the implosion of the alcoholism defense or the inconsistency between what Dr. Litman and Dr. Price said versus what Ms. Villanova had said? Did you present anything about the premature reliance on the testimony by Dr. Litman and Dr. Price when it was going to be contradicted by Marty and Kathy Silva, etc.? Is there anything that I overlooked when I read your OCC application that intimated any of those arguments? Yes. Well, I've got it, so point me to it. Well, I don't have it directly in front of me, but there's a point in there where they say, they said child counsel presented an intoxication offense, and they said had this been properly investigated, it would have been reasonable. Had they properly investigated the voluntary intoxication offense, it would have been reasonable. That's the sentence in there, and the application, it goes through and it talks about the relative from the lay witnesses to the expert witnesses. It says had they investigated them, this would have been more accurate. Are you saying it wouldn't have been reasonable for them to present that defense? Isn't that your argument, that had they investigated these particular witnesses, it would not have been reasonable to present that intoxication defense? Our argument is based on the failure to investigate, and then what was said in the OCA application, the state pleading, was that had they done this investigation, presentation that was informed and honest would have been reasonable. So if there was a strategic decision based on knowing all the information, then it would have been reasonable, because then we're up against strategy. But counsel, let's say we agree that, and I think it's obvious that their primary theory of defense was that he was someone who had chronic alcohol abuse issues. And at Merritt, they sought a voluntary intoxication instruction until they did, and then they abandoned that. They sort of jumped off that horse halfway through the race. But they did more than that in sentencing. They did focus a lot on and presented evidence about alcoholism, even when the family members seemed to contradict that in the state's case. But they did present, of course, the testimony of Dr. Villanueva. She, in defendant exhibit two, goes through these eco maps that present the social history of Mr. Martinez that is based on topics well beyond just alcohol abuse. So when we compare not just that presentation, but also in conjunction with the other evidence that they presented that was to their primary theory of alcoholism, why isn't that sufficient for us to conclude that they looked at their, the evidence that had been gathered in mitigation. Even if I may not have agreed and gone with their primary theory of defense, but at least they still presented an alternative theory of defense, which was more of a traditional mitigation defense in capital case. But I think the problem with it is the traditional case was presented after the involuntary intoxication, and that essentially comes together when it's incorporated. So we're essentially dealing with one big sentencing phase. And once you present to the history of alcoholism testimony, and you blow your credibility like that, and I have the trial counsel, they told the jury, we presented intoxication because, frankly, we don't understand what happened that night. Maybe intoxication explains it, maybe it doesn't. And then you have the state picking up on it. Now you heard Luis Martinez get in here, and he says, you know what? He doesn't allow drinking. And then even to the judge, outside the presence of the jury, when the defense dropped the voluntary intoxication defense, the judge says, for the record, that's the fact that you're not requesting a voluntary intoxication. I believe I'm not trying to put words in the state's mouth, but I believe both Mr. Valdez and Mr. Subman have ample arguments which they believe you have not been entitled to it. And the state picks up on it again. I find it interesting when counsel has to take up for their experts. That's the first thing that comes out of the prosecutor's mouth and their second closing argument. And so what happens with this implosion of evidence, you undermine their credibility, and then they go into the second, the later half, with the more traditional mitigating evidence, and they present it largely through one expert. So it's after all this, but it's also after defense counsel told the jury, hey, we know our guard's a liar, because he had said two statements initially that were outlandish. And they, I don't know if I have it directly in front of anybody, but he says, these are the two most outlandish statements I've ever heard a client say. The prosecutor. This is the defense counsel. The prosecutor said, yeah, Mr. Martinez, he had these two statements, put the blame elsewhere, that was a lie, it was outlandish. And then the defense attorney gets up there and says, yeah, these are the two most outlandish statements I've ever heard a client say. Then they present voluntary intoxication, which is relied on entirely by the client. The client tells the first expert, and the second expert doesn't even talk to the client. And so he relies on Dr. Price's affidavit. And then we also learn about these mental impairments, which this court has said is strong mitigating evidence. And so once we get to the point of the third mitigation, or the third expert with the traditional mitigating evidence, they've suffered some major blows to credibility. They then present this argument fully or near fully through one expert. And the state picks up on it again. The state asks them, are you aware of this testimony that the mother of his children had said he's a casual drinker and so on, who'd you talk to? And they tell the jury, this isn't Martinez's defense. This is Villanova's defense. This is not based in reality. But in your reply brief, I thought you were arguing something quite a bit different, and that is if there had been greater investigation, if Mr. Hudson had talked personally, say, to Kathy Sobo, or had a better handle, despite Mr. Millis's two conversations with Marty, if Mr. Hudson had a better grasp of what the witnesses were going to say, he could have not abdicated his alcoholism defense, but he could have presented an alcoholism defense that was more grounded in reality, that could have maybe softened Dr. Price's perspective and presented maybe a more modest but more internally consistent alcoholism defense. Yes, that's the argument. I'm sorry if I confused you on just what I said. There's nothing necessarily ineffective in him presenting an alcoholism defense. You're not arguing that. Well, once they choose that defense, they have a, generally, we know from ABA guidelines, they have a duty to investigate the family. And in this court, Hooper v. Mullins, we know that once you choose a defense, there's more emphasis on investigating it. So had they investigated it, it would have essentially looked like from the beginning. What happened at trial, they abandoned it, and it essentially turned into a mitigating circumstance. Why do you say they abandoned it? He abandoned the instruction, but he was very specific. Mr. Hudson was very specific. In fact, the OCCA specifically found that it was not ineffective. With Mr. Hudson's really extended colloquy to explain, I'm not advocating my alcoholism defense on the first stage, but I am withdrawing my proposal for an instruction because the instruction is going to make it sound to these 12 jurors that I have the burden, as defense counsel, to prove alcoholism is going to preclude a finding of malice of forethought, and malice of forethought is obviously, under the judges' instructions, going to be something that the prosecution has to prove beyond a reasonable doubt. So it seemed a pretty cogent explanation for why Mr. Hudson was withdrawing his request for an instruction that would have appeared to put the onus on him, the burden on him, on alcoholism. So I didn't see anything that suggested he was midway saying, oh, it imploded, I'm not arguing alcoholism anymore. Well, this is what we think they tell the jury at the closing argument. We presented intoxication, frankly, because we don't understand what happened that night. And I don't mean to say that, you know, they admitted... He doesn't know why he broke into, you know, went into this home and got with Sean and, you know, had sex with this elderly woman and brutally killed these people. He apparently was sent out in the morning to go hog hunting. You know, what was... That seemed like a pretty reasonable thing for a defense counsel to say, in order to engender credibility with the jury, how in the world could he get up with a straight face and say, I know why he did this? You definitely can't do it after having not done the investigation. The performance aspect of it was you got to investigate him. And that's more or less true regardless. Go talk to him. And then what happened with this, and what I mean by, you know, kind of gave it up, is that it started with such absolute terms, voluntary intoxication, they really ran with it. And then at the end of it, when they're talking to the jury, they're saying, maybe so, maybe not. And then I think from the record, once you read it, it's clear. Everyone in that courtroom had realized that this presentation had imploded. I think it's clear from what the defense says in the closing argument. I think it's clear from the state. They picked up on this pretty clearly. And the state essentially did what was expected out of defense counsel. The state got these expert reports that said voluntary intoxication, drink every day since he was 13. The state went out and talked to the family. And then they put the family on. They put it on their witness list, and then defense counsel. And in the face of that, they still brought forward and presented this all-or-nothing defense. Which all points a bit to strategy. They had these witnesses. They knew that they have memos from the investigators saying that the family members have different impressions. They list these witnesses as potential witnesses. They're thinking about it. They had awareness about these witnesses and what they would testify. So we have to presume that that was strategy. You want us to presume that despite all this information that they had, it was just a huge error. It was just a huge performance issue rather than strategy. Some reason that they didn't put these family members on. Well, the strategy must be based off a reasonable investigation. And that's why Strickland requires us to look at the investigation, which the state court did not do here. They referenced it online. But I think what's most telling is, yes, there's documents in their possession. But I think when you read the transcript, it's clear that they didn't know this was a more nuanced defense. This was a mitigating circumstance. This wasn't a voluntary intoxication. At first stage, was there any other defense other than voluntary intoxication to rebut one of the elements of the prosecution's burden of proof? He admitted that he committed the two killings. The only element that anybody has alluded to in any of the briefing or so far in the arguments is on malice of forethought. Mr. Hudson then decided at first stage to question the prosecution's ability to prove malice of forethought by arguing that he was voluntarily intoxicated and therefore couldn't formulate malice of forethought. Only at that point was that an ineffective or deficient performance under Strickland to rely on an alcoholism defense at first stage. And if the answer is yes, what else could the prosecutor have done other than just say, we're going to admit all the elements at first stage and proceed directly to second stage? Well, I think its performance is deficient once they go to trial with a known defense and they present something contrary to it without having done the investigation. But the first stage wasn't completely alcoholism or a history of it. They also mentioned his mental impairments, which this court has said is strong mitigating evidence, some of the strongest. It mentions that his executive functioning is impaired, no brakes on the car, and it talks about his memory is impaired. Now, were those elements relevant at first stage or second stage? Well, I think what you would do at first stage in this context is you front load the mitigation. And this is professional practice as you prepare the jury. All right. Let's say the judge says, okay, counsel, I understand why you want to do it. Maybe everybody wants to do that. Why is this relevant on the elements of the burger? And you say, well, I want to front load my mitigation. I mean, what's your answer on why is it relevant to the elements of the problem of facial burden on whether or not he committed first degree murder? The mental impairments. But we're not saying that the voluntary intoxication events, you know, the prejudice or the difference just would have been absent. We're saying they could have presented an informed defense. I mean, the state enclosed an argument, I forget what state, but they say, yeah, you know, he probably was drunk this night. And so they still have evidence for malice. I mean, their argument was essentially it would have been the same. The only problem is if they jacked it up to 11, probably because juries are unsympathetic for the defense. Counsel, but whatever decision they made to pursue a theory of defense on the merits is not before us. Your IEC claim rests entirely on they were infected in the penalty phase. And so I want to ask you about the decisions that were made regarding these three witnesses because, of course, your certificate of appealability is cabined by these three witnesses. And I hear your argument and I think I understand it about the failure to properly investigate these family members and how that then leads to decisions that were made by counsel that were not informed. So they can't be deemed reasonable. But the information about Mr. Martinez is, again, social history, some trauma he suffered as a child, the big family secret being revealed later that his biological mother or his sister was actually a biological mother. All that went before the jury, again, through Dr. Villanueva. And the district court here in the federal proceeding, of course, makes findings about the reasonableness of why they would not have called Luis Martinez, who, by the way, the jury, of course, had met already and the defendant counsel had seen at the trial, and also made findings about the biological mother, Ms. Lopez, and why there could have been a real valid reason not to call her. And then also made findings about the brother who had just re-employed from Afghanistan, how his testimony would have been cumulative with the sister, Cassie. Why can't we just rely upon all of that to make a conclusion here that counsel's decisions that were made, again, may not have been the best choice, but they were at least informed by what they observed at the trial, what they knew before trial, and at sentencing, all the information essentially still got before the jury. Just to be clear on this one aspect, the guilt phase was incorporated into the punishment phase. We're essentially looking at one big punishment phase, where the state and the defense, well, they incorporate certain witnesses. And, of course, jury instructions are told about how they can interpret that evidence. And I understand, of course, the same jury, and it's set through the trial, and, of course, they're going to take a look at what they heard from the merit stage. I understand that, but I'm focusing on their strategy at sentencing, not their strategy on merits. Yeah, and so I just have to, one informs the other in my argument. But what happened at the guilt phase, once they lost all that credibility, they paid a major price in that. And so when they presented the mitigation phase in the latter half, they presented it in a shadow of what had just happened. And that shadow is Mr. Martinez, he embellishes sometimes. These experts, they only talk to Mr. Martinez. And the experts, they don't agree with the family. And then they go up and then they present an expert who says that the near majority are absolutely all the testimony, or a lot of it. And then they have his sons and his sister. But, you know, the problem with this, and I think you can juxtapose this to what they did with the future dangerousness testimony. You know, they presented people that had laid eyes on Mr. Martinez every day, and they got up there and they testified to it. And that's how you're supposed to maintain credibility with the jury. Yeah, I would just like to reserve the balance of my time. Robert, stop the clock. So we're not punishing you on your rebuttal. Yeah, go ahead. You're not taking away time. Can I ask you also about the remedy that you're seeking? So you have requested several times, both before the state proceedings and at district court, an evidentiary hearing on the IAC claim. The evidence, the documentary evidence that supported the claim at OCCA, I believe there were three affidavits. Obviously there was a lot more presented at federal court. Can you help me understand, one, what is your best argument for why this court should grant a remand? And I don't mean necessarily like why it's ineffective, but what is it specifically that a remand would do for the district court to develop a factual record to make findings that it hasn't already had before it? I think there's three kind of systemic ways that the district court messed up. One is that the district court didn't consider all the evidence before it. I think what the district court did is it essentially thought Penholster applied to the prejudice evidence, and it didn't say a word of it. And Penholster doesn't bar that. 2454D2 doesn't bar that. Could you just repeat what you just said? Because I didn't, I just, that's part of what you just said. So the district court, the evidence we presented in federal court of prejudice, it didn't consider that evidence. I think it didn't consider it likely because it thought this wasn't presented in state court. And a lot of it wasn't. But we're not under E2 because, as Judge Federico said, you know, they tried. They did all they could in state court to get a hearing. They went out and investigated it. They got affidavits. They presented them. State court said no, no hearing for you. And then... On the prejudice element, not the deficiency. Altogether, there's no hearing in state court. How does that work? No, I know that. But on deficiency, you're, I mean, you've, in the briefing, Cullen versus Penholster precludes you from having an evidentiary hearing irrespective of your diligence. If we apply ADBA on the deficiency problem. Yeah, so on the performance problem, you have, that has to satisfy ADBA. And that has to satisfy ADBA with what was presented to the state court. But once that is satisfied, we are able to present evidence like in Harris versus Sharp. And what we see in this trial, you know, I'm sitting here saying it seemed like trial counsel just went ahead and wasn't informed. That's what happened. But, you know, if you get over ADBA and you look at the affidavits, that's what happened. But then my other point on the prejudice is that, so it didn't consider this evidence. We think it considered evidence it shouldn't have. It looked at post-conviction application that trial counsel was unaware of. And that it said, you know, basically it did a prejudice analysis to determine performance. It said bad witnesses, don't worry about them. But they still had to investigate them. And then it also has a Wilson versus Sellers argument. I think this comes directly from 2254D. We're talking about what the state court knew, what was in front of it. And what the district court did is it came up with its own reasons. It said these are bad witnesses. We don't have to investigate them. The state court never said a single thing about the quality of these witnesses. It never said, you know, it used this presumption to say, well, presume that they found it. But then it ignored all the evidence. What do you say to this crab who responds to your Wilson versus Sellers argument and says that you have completely misunderstood Wilson versus Sellers? Wilson versus Sellers was talking about the look-through principle. When there's a summary disposition by the OCCA or another state's highest court, an equivalent proceeding, and there is an extended discussion by an intermediate appellate court or by a trial court, then just like we do in Social Security cases or immigration cases, we apply a sensible look-through principle. That we can look through the summary disposition and say, you know, basically, a prime example would be, you know, we affirm for the reasons stated by the trial court or the intermediate appellate court. And so you can look through to the next highest court, maybe the trial court, and then infer that the trial court or the intermediate appellate court's more reasoned decision must be what the Oklahoma Court of Criminal Appeals relied on. That's what she interprets Wilson versus Sellers as saying, and frankly, that's what it seems to me. We all have all of these opinions that say an Oklahoma Court of Criminal Appeals opinion triggers AEDPA deference, even if it just has a sentence saying we affirm or we deny post-conviction relief. What's your response to that? I think generally it's right on Wilson, but I think the basic premise of EDPA is what did the state court know? What did it say? And so Richter says if they said nothing, make something up essentially. And Johnson says you presume that it was adjudicated. And then what Wilson says, it has this look-through principle, but it says at the beginning, you train your attention on what the state court did because that's what makes it unreasonable. And this is often the problem that petitioners have. You know, you want to present all this evidence. What did the state court know? And so we're asking if the state court was unreasonable, what did it say? Well, that's where she says, okay, well, he said that in your brief. And so what she says in her response brief is that's exactly what the Supreme Court condemned the Ninth Circuit for doing in Sexton v. Boudreaux, where the Ninth Circuit had said, you know, we, the Ninth Circuit, are going to constrain the states of telecourt to what they had said, and unless there was affirmative explanation that would support that decision, we're not going to subject the state of telecourt decision to deference instead of doing what Richter requires, and that is looking for any reasonable explanation for what the argument had done, which I think Sexton v. Boudreaux adds is completely counterintuitive because you're condemning the state of telecourt for not giving explanations that were never even made into the state of telecourt, which is precisely what she's saying in this case, that the implosion of the alcoholism defense, frankly, to a large degree, your arguments about the investigation, that these are arguments that you have very effectively put to us, but arguably are not on pages 10 to 18 of the OCCA opinion, and you're doing exactly what Sexton v. Boudreaux had condemned the Ninth Circuit for doing. What's your response to that? I think on the first part, you were mentioning Wilson, and then essentially exhaustion, and just on the Wilson thing, it says if you have an opinion, it's not a summary dismissal, if they give you an opinion, look at it, that's what Proclamatory Wilson stands for, and then it goes on to say, well, if they didn't, and the lower court did, look through it. Yeah, and then on exhaustion, I think the state practice and procedure informs our opinion on exhaustion. I think it's important to note what happened here, that they turned in a state habeas application, and they turned that in about a year before they got a direct appeal opinion. They turned it in, OCCA said, you know, you lose, there was no response, no reply, no hearing. Typically, I came from South Carolina, it's like this in many places. You turn an application in to a state court, you go pleading, you get a hearing, a mandatory in South Carolina, in many states, this is their contestant effect. You go to a hearing, you put all this on, and then you have an appeal. There's just so much opportunity to develop these cases, and once they get to federal court, I mean, you'd really love it. They're crisp, they're laid out, and everything, but here, we don't get any of that. Well, yeah, and I totally submit to that, but, you know, we're not King Solomon. I mean, we have to follow the Supreme Court precedent, and we have to follow our own precedent. But it sounds like, if I can make sure that I'm understanding, it sounds like you're agreeing, at least with the principle that if the OCCA opinion doesn't address all of the arguments, that it's still going to be subjected to the ADBA deference. I agree that, so prejudice de novo, and that's from Ronpilla, and that's from Ronpilla v. King, which is after Richter, and I agree that... On the deficiency, Ronpilla, that's what we're talking about. And on deficiency, EFPA applies, but the only part about Wilson is once we have EFPA, and once we have an opinion, we train on the four corners. We can't say that they were reasonable for something else. Even if you're faulting, Wilson v. Sellers, the OCCA for failing to address an argument that you had not presented to the OCCA? We claim we did present it. Let me put it in a hypothetical way, because it sounds like exactly what Sexton v. Boudreaux says. Hypothetically, if those six paragraphs of the OCCA opinion on the deficiency problem did not include, say, two of your arguments to us, are you saying that we cannot apply ADBA deference 2254-D1 to those two arguments because the OCCA, to its infamy, failed to address these two arguments, even if you had not presented, hypothetically, if you had not presented? So you would agree that we would only evaluate reasonableness if you had fairly presented those theories to the OCCA? That's all I'm trying to ask. Yeah, I apologize. I was confused. ADBA deference, double deference, all of performance. We agree to that. And if the OCCA failed to consider two arguments, we really wouldn't say that was an unreasonable application of Strickland if, hypothetically, you had not presented those two theories to the OCCA. Yeah. Well, if you haven't... That's okay. Do you agree that if you haven't presented those theories, if we decide you haven't presented those theories, you didn't exhaust? If you decide those were not presented to OCCA, that would be a failure to exhaust. And your argument is that somewhere in this petition you think that we can find that you presented these theories. But it's implicit because it's not explicit. Well, I would just say at one point they say they want less intoxication, they should have presented it, and it's not a long document. You know, it's loose and it's... When you come back, maybe you could point to the exact paragraph. Yes, thank you. We're not clear. I'll tell you what. Do you have an objection if I give... He ended up with 2.30. If I give the petitioner a total of six minutes on rebuttal. I do not. Obviously, it's an extremely important case. Robert, on rebuttal, let's increase his time to six minutes. Good morning. May it please the Court, I'm Jennifer Crabb representing the warden, Christy Quick, in this case. I would like to start where the Court left off, which is with the question of exhaustion and whether the first post-conviction application raised this claim. And I believe I know exactly the pages to which Mr Van Winkle is referring. And that would be pages 10 to 11 of the post-conviction application, or if you're looking at the record on appeal, it's volume 1, pages 139 to 40. And what it says is that... And I'm just going to read it to make it very clear. In an attempt to save Mr Martinez's life, defense counsel argued throughout trial that, while too intoxicated to form the requisite intent for first-degree malice or thought murder, Mr Martinez was, in fact, responsible for the homicides and the assault and battery of the dangerous weapon, and he should not be sentenced to death, period. As such, Mr Martinez's case may fairly be called a second-stage case. The only real question appeared to be what punishment was appropriate. And this is the sentence. So the argument is not that something was wrong with the intoxication defense in and of itself. The argument was that these three witnesses could have provided traditional humanizing mitigating evidence. And so I would assert, based on that, that the claim that is now before this court is entirely unsought. It is transformed to the same extent as the claim in Tryon, which was decided last year. If the court, one, accepting that, I think there's a lot of procedural hurdles here, not only exhaustion, but I argue that the claim is very different as well from what was raised in the district court, and therefore waived, and also that it's beyond the scope of the certificate of appealability. But because you did spend a lot of time with Mr Van Winkle on the actual claim of intoxication, what I would like to point out is that, even now, it's not clear at all what it is that counsel was supposed to do. So they had evidence, not only from these two experts who testified in the first stage, Dr. Lippman, and, I'm sorry, his name escapes me right now. Price. Thank you, Dr. Price. But also, in the second stage, Kathy Sobo, Petitioner's biological aunt, testified that he started drinking heavily at the age of 18. So there was evidence, there were witnesses who would say that Petitioner began drinking very heavily and consistently at a young age. On the other hand, there are witnesses, the ones who were not called or questioned by counsel, Marty and Roberta, who would have said, and then there were some who were called by state, Ms. Elan, the girlfriend, who said that he didn't drink that much. So what's the truth? The argument today seems to be that, well, the truth was what the state witnesses were saying, and so counsel should have presented, I guess, a less full-throated intoxication. Well, is that fair? I mean, what he's arguing is, I think, is on their own witnesses. I mean, especially the vast land between what the combination of Dr. Lippman and Dr. Price said versus what Ms. Villanova said, that Dr. Price said that, yeah, he started at age 15 when he was a teenager under Marty's roof, that he was drinking every day. I think Ms. Villanova says, no, that's not true. I think she says that, well, it was when he got together with Teresa, who had addiction problems of her own, which is later in life. He's a full-grown adult. Marty says, well, I don't even allow a beer in my house, so he sure wasn't drinking as a 15-year-old. I mean, if you just look at their face, these people were all over the map about when he started drinking. And that just really seems to be starting on the wrong foot in terms of engendering your credibility on this alcoholism defense, which is half of his mitigation theory. Respectfully, I'm just agreeing with Your Honor's memory of her record. I believe it was Roberto Lopez in either the first or the second post-conviction application, his biological mother, who said that Petitioner did not start to drink heavily until he got together with Ms. Elam. What Dr. Villanueva testified to was that he began to use alcohol and marijuana at the age of 15. So she actually was much more consistent with the first stage experts. It's from the family members that we have that's different. And Dr. Villanueva helped to explain that, because what she testified to is that Petitioner hid his alcohol use from Marty and from Kathy Sobo. And so it was all consistent, right? There's no evidence that presented to you today as to what it was, like what should the amnesty say? What should the testimony have been? Counsel certainly couldn't have asked any of the witnesses to lie. They're testifying to their own personal recollection. And then that was explained through Dr. Villanueva, well, sure. But, you know, it's not surprising that a 15-year-old who might be drinking in the home of his father, who doesn't allow drinking, would hide that from his father. Counsel, what I heard Petitioner say isn't that the decisions that were made about what to present in terms of evidence is part of it, but really it's the investigation piece. And the, of course, not just the ABA guidelines, but a number of Supreme Court cases, our case has talked about the duty to investigate, particularly in a case where that penalty is on the table, and to look at all reasonably available mitigation evidence. And then that informs the choices that counsel make in terms of what they present during the sentencing hearing. So the state's briefing focuses a lot on presentation and a little bit on the investigation. But I wondered if you, in the context actually of the procedural bar, because they raise an IAC claim, doesn't that sort of import the duty to investigate with just raising the correct legal standard itself? And it's inherent then when they're talking about these decisions between humanizing the client and intoxication, it all rises and falls on this duty to properly investigate so that reasonable informed choices can be made. Yes, of course. And the Court of Criminal Appeals recognized that his claim was that trial counsel did not conduct an adequate investigation, and they found in a specific factual finding that counsel did do an adequate investigation. And in terms of the scope of the claim that's properly before this court, there was simply no evidence presented to the Court of Criminal Appeals to the contrary, because the evidence that was given to the Court of Criminal Appeals was from trial counsel's files, showing that trial counsel had done this investigation and was aware of these witnesses. And so there's no evidence before this court, frankly, there's no evidence properly before this court, but I don't think that there's any evidence even, you know, considering all of the evidence, that counsel didn't conduct a thorough investigation and talk to these people. Well, how do you respond to the petitioner's argument that before the OCTA they weren't really afforded an opportunity to develop a factual record? So if we're going to compare what was in the OCTA post-conviction record overall to what was presented later in the 2254 application, that part of the reason it's not procedurally barred, that it is a substantially similar claim that was raised in a federal court, is because they did not have an adequate opportunity to develop a factual record that they've received. I have two responses to that, Your Honor. The first is that I'm not aware of any law. There is an exception to the exhaustion requirement. Exhaustion would be futile, but I don't think that's the argument that the petitioner is making. I'm not aware of any case law that says that you have to have a certain number of pages or a certain length of time or an evidentiary hearing in order to exhaust a claim. And secondly, that argument is squarely foreclosed by Fairchild v. Trammell. And then also a subsequent case called Finlayson, which I do think I cited in my brief, and Finlayson says, unlike Entrevino v.  an Oklahoma defendant's opportunity to develop evidence is more than just theoretical and is not at all impossible to use successfully. And so as a factual matter, this court has already rejected any argument that there is insufficient opportunity to develop an ineffective assistance of counsel claim. I'm happy to answer any other questions the court may have. So assuming that we did find that the claim was exhausted, obviously the OCCA did make that finding, as you state, about investigation in general, but it said nothing about, obviously, the particular claim that's being made now here. So how do we interpret that? Assuming that you found it exhausted, I believe that under Johnson v. Williams, you would have to presume, and there's no rebuttal to that, that if it's exhausted, that the Court of Criminal Appeals decided this claim in a this argument that we assume was made.  Or that they knew was made. Correct. So, for example, on the implosion of the alcoholism defense, so if we decide that it was exhausted and that we do apply the ADPA, what do we do with the argument that, I think to some extent, is what the petitioner is relying on, the Wilson v. Sellers case, to say, well, how can we say that the OCCA's adjudication of the implosion of the alcoholism defense was reasonable when the OCCA never mentioned that? Well, and that, I think, is the problem with assuming the claim in this case is exhausted because there's so much evidence that was not in front of the Court of Criminal Appeals. In the Tryon case, in his first post-conviction application, Tryon had argued that counsel wasn't effective for not adequately challenging evidence of a jail fight. In the second post-conviction application, the petitioner raised the same claim, but he added one piece of evidence that he said counsel should have used to challenge that fight. What this court said in Tryon is even with just that one piece of evidence, that that rendered the claim really exhausted. So here, there's so much evidence that it's not exhausted. However, yes, I definitely agree that under Sexton, that this court cannot consider all of this new evidence because the Court of Criminal Appeals didn't have the opportunity to rule on it. Well, I thought it was, not in terms of evidence, but just because, obviously, we're circumscribed by a pinholster, but I thought it was arguments. Sure, that as well, Your Honor, and that was also an issue in Tryon because although it wasn't exhausted in the state court, in the opening brief, Tryon argued that counsel should have also presented a witness to contextualize the jail fight, the conditions of the Oklahoma County Jail, this is why this happened. And this court called that an aspect of the claim and said that it was unexhausted and procedurally hard. Do you remember Wellman v. CDOC? Does Wellman apply? It does. It says that we do not expect state courts to address arguments that parties did not raise. And so Wellman v. CDOC would apply if we consider the claim fully exhausted? Correct. And so, in other words, if the petitioner, your argument, I guess, is if the petitioner survives exhaustion and procedural default, then we would apply the 2254-D1 and we would determine that these six paragraphs in the OCCA opinion on deficiency was reasonable based on the arguments that had been presented. Based on the arguments in the evidence presented to the state court. That's correct. So, I want to ask you about something that you said that surprised me. You said that the OCCA rejected the investigation defense or the investigation argument. I thought part of your argument in your red brief was not only the implosion of the alcoholism defense, but the fact that he failed to investigate, Mr. Hudson failed to personally investigate these other collateral family witnesses, Richard, Roberta, and Marty, that that had not been in the OCCA application. Sure, I can explain that. So, the first post-conviction application nominally said counsel failed to investigate, prepare, or prevent. And so the Court of Criminal Appeals took Petitioner as word, said twice his claim was a lack of investigation plus preventing, and then said that counsel's investigation was reasonable. What changed between then and with each iteration of this claim is the extent to which the investigation became the focus of Petitioner's claim. And that was the second post-conviction application. Yes, correct. Is that what you were talking about? Yes, that going on into the opening brief as well. Okay. I know these questions are all over the place. So, one of the things that also surprised me about your brief was that you said, I thought that Judge DeGiustine had failed, or that it had not been presented, it had been forfeited, on this investigation theory on deficiency. And when I read the petition that was presented to Judge DeGiustine, it surprised me that you were arguing forfeiture. Here's why. Because Petitioner's Ground 2 was an ineffective assistance of counsel claim, but it was broken into two parts, two distinct subclaims. Subclaim 2B was the claim that was raised in the first post-conviction application, the three family members. Yeah. But it did add an affidavit from Roberta Martinez, an affidavit from Marty and his army records, and then some juror affidavits. And Norma's, right? Norma's... Oh, no, that was in the first one. That came in the second post-conviction application and in Ground 2C. Okay. So, Ground 2B was essentially the post-conviction claim, but not really, because it has these affidavits and it changes the focus from, he had a good childhood, but he did have some things to overcome in that childhood, to actually, he was abused as a child. And then it was in Ground 2C where the focus really shifted to the failure to conduct an entire exhaustive mitigation defense. And so, my argument is that, as to the claim that is properly exhausted, which was raised in Ground 2B, that the arguments the petitioner's making now are different and broader than those that he made in the district courts. Okay. I want to ask you about the N-word. Yes. On that issue. And in particular, I want to ask you about whether or not the OCC adjudicated that claim. Give us your best argument for why the OCC adjudicated that claim. The Eighth Amendment claim. Okay, thank you. Because they specifically acknowledged it, for one thing. They said that he was thought, that he argued that he was denied fair sentencing proceedings. And then, yes, they specifically, let me actually move back up and start with the way it was briefed. The way it was briefed was, fair sentencing proceeding was in the heading, along with evidentiary harpoon in First Amendment. And then, the entire argument was evidentiary harpoon in First Amendment with a tack-on sentence that said, and it violated the right to a fair sentencing proceeding. And then, following that sentence, there was a footnote that cited Caldwell. Well, there was also a sentence in the text. Yes, the one that, yes. About the Eighth Amendment. About the Eighth Amendment. Yes, it said, and he was denied a fair sentencing proceeding, and that's the sentence. Under the Eighth Amendment. Yes, yes, correct, yes. All right. Yeah, yeah, I'm not arguing that he didn't adopt it as a federal right. Okay. And so, then the court expressly recognized that. That he's arguing that he was denied a fair sentencing proceeding. And then, they talked about, they focused on what Petitioner focused on, which was the evidentiary harpoon issue and the Dawson versus Delaware claim. And so, under much of this court's precedent, and especially Johnson versus Williams, we know that they didn't just forget that he raised that claim, because they expressly acknowledged it. And while the Eighth Amendment claim wouldn't be entirely subsumed within the state law evidentiary claim, it's largely subsumed within that, because, you know, was it properly, not that it was properly admitted, but was it state law error, or wasn't it state law error in the form of an evidentiary error. So, then what the court said was that any error was cured. So, that finding, that any error was cured, would certainly go, not only to an evidentiary harpoon claim, but also to an Eighth Amendment claim. Well, it would apply to a 14th Amendment claim. Yes. A due process claim. Correct. Well, and yes, if you, you know, because Caldwell actually has no application here, then yes, although I guess you could say that because the crux of Caldwell is that the jury can't be misled here because the jury was properly instructed. Right? Don't consider that. You know, even were this properly an Eighth Amendment claim under Caldwell, the Court of Criminal Appeals addressed that when they said, no, the jury was properly instructed. They weren't misled as to their role. One of the things that the petitioner relied on was Judge Egan's opinion in White v. Graham, and as you know, that was reversed, but not on that ground. I mean, it was a different theory that the panel relied on, and Judge Egan, at least, did credit the petitioner's, I think, hook, line, and sinker, this exact same argument. If a petitioner identifies the claim under the ex-provision of the Constitution and then adjudicates, you know, and then explains what the decision is, maybe it was neglect, people are fallible, judges are fallible, and apparently the Oklahoma Court of Criminal Appeals failed to adjudicate the claim that they had already identified. So what's wrong with that as a rebuttal to the Johnson presumption? My memory, Your Honor, is that in this court's Graham decision that you actually did overturn that finding under Johnson v. Williams because you then went on to find that the Court of Criminal Appeals decision was reasonable under 2254. Well, we did that, but wasn't the rationale, it was the premise of the state claim was coterminous with the premise for the constitutional claim, which is a little bit of, and that's, I'm just wondering if that's a distinction between our panel opinion in Graham versus what we have here. Yes, I think it is, but that's not the only ground upon which Johnson v. Williams applies. In fact, there's a presumption that it was decided, and it's the petitioner's duty to actually present evidence that that's not the case. But even saying it's not a presumption, Johnson v. Williams also recognizes that when the petitioner doesn't devote a whole lot of attention to a claim, it's reasonable for a busy state court to also not separately address it exclusively. Yeah, okay. So regarding this claim about the racial slur being interjected in the proceeding, the petitioner argues in the opening brief that the prosecutor essentially provoked the witness into using that. Isn't that a fair argument or reading of the record? Because what I couldn't figure out through the examination of Ms. Carruthers is why the race of those two individuals mattered at all, unless the purpose was to provoke her to say what she ultimately said. Well, I have a two-part, excuse me, a two-part, I think a three-part response to that. One is that that aspect of the claim was not raised in state court, and so it would be un-exhausted. The second is that it's plainly rebutted by the state court record, wherein the trial court explicitly found based on the prosecutor's demeanor that the state was, quote, as a cord and shock as much as anybody besides yourself. So we have that state court finding which would be binding under 2254E1. You're talking about what Judge Smith found on the spot during a sidebar? Yes, correct. And then my third argument that goes more directly to your question is the relevance of, and this is absolutely setting aside the use of the racial epithet, but the relevance of the race of the victims of Mr. Martinez could potentially be relevant, because this was an unprovoked attack. They're sitting in the drive-thru lane in a car, and these two individuals are walking. There's no provocation, no interaction whatsoever. Mr. Martinez jumps out of the car and takes them down. So were that a racially motivated attack, that is more aggravating, I would argue, than were it not, and that's why we have special laws against hate crimes. Does that include the use of the N-word? Most likely not, because of the special sensitivity to what the Supreme Court has recognized that's abhorrent about the use of that word. Well, then why in the world did Mr. Valdez say, well, what did he say? He knows exactly what Martinez said. Well, it's not clear, Your Honor, from the record that he does. We have the pre-trial. Well, sure, that's what she said at the trial. But we don't have any evidence that in pre-trial discussion... Oh, that he knew. Yes, that that word was, yes, that. All right. All right, thank you. Thank you. To start, I just want to clarify one thing that we're doing. Our claim is a stripling failure to investigate the three witnesses. And we're saying the evidence of that failure is partially based on the trial transcript. And one reason we have to do this is we have to meet OVIL on its terms. Under 2254D, we look at that document. We're stuck with it. And that's the only thing we have. We have an application. We have a denial. We don't have a response from the state. We don't have an appeal. We don't have a hearing. And, you know, that's pretty detrimental to a stripling claim. If you look at all the cases from the Supreme Court, Williams, Wiggins, Ronquilla, Porter, Sears, Andres, the one thing they have in common is substantial state pleadings and big evidentiary hearings. And I think that knowledge, you can inform your decision on your lawsuit. I think O'Sullivan from the Supreme Court touches on that as does Trevino. And I think, at least for the actual briefing, there is some language, and I'll go off 10, investigated their testimony and prepared their witnesses more thoroughly. They investigated, developed, and presented mitigating evidence. And it's words like mitigation and humanizing. They are broad, but essentially what we're talking about in our opening brief is a mitigating circumstance, a history of alcoholism. And that's a mitigating circumstance that's well known. Courts deal with it all the time. And then the specific language of humanizing, I don't think there's much of a difference. There's a difference between humanizing and mitigating. But this is what the appellant, they're using the state court's opinion against them. Not against them, but they're trying to help themselves with it. Which is exactly what we did here. We essentially just did what little John Wilson say. There's these three principles, we went through them. And that's the biggest difference between these two pleadings. That and that ours is significantly longer and our office has significantly more people and more money. And then... Can I ask a question? When you were before us moments ago, you mentioned something that I also noticed, which was that the first post-conviction application was filed before OCCA, before the direct appeal was finalized. Do you think that informs in any way how OCCA treated that application in terms of, again, providing an opportunity for the petitioner to develop a record? I might not be following the question. Well, just the timing of filing a post-conviction application before they've even decided the direct appeal. I mean, do I have that timing right? I think that was filed in 2016. They don't get an opinion on direct appeal until 2017. I guess I'm asking, that seemed odd to me. I wanted to know if you think that informed at all OCCA's review in that post-conviction application in terms of what was going to allow the petitioner to do to develop a factual record instead of hearing or just decided at all when they did not yet have the direct appeal opinion issued and filed. Yeah, I think that's a pretty big deal. And I think from the actual statute, what the exhaustion says, 2254 BNT, all it says is the question presented. I know we're a long ways from the statute when it comes to EDPA in this particular area, but once we're so far from the statute, what we're talking about is equity. Exhaustion and equity, they inform each other. Holland v. Florida said equity finds a comfortable home in a habeas corpus. And the state process, as the Supreme Court said in Trevino, the state process can inform our decisions on equity and exhaustion. Can I try to clarify one more time what your theory is here? Because I'm still really struggling with what you presented in your petition. And there are at least a couple of references to the failure to present additional family members and friends who would have been able to humanize Mr. Marks. And it's pretty clear you're talking there about humanizing him, and you specifically say as mitigating evidence in the sentencing case, correct? But now you're suggesting that that should have been interpreted to say that these witnesses should have been presented in the guilt phase? Because you said because they weren't presented in the guilt phase, counsel lost all credibility in the guilt phase. And that affected, as you said, the second half of the sentencing where there was this shadow on the second half of the sentencing. That's how I understand your argument, but you're talking about two different phases. I don't know how that could have been interpreted to say now they should have been presented at the guilt phase. Which is what I think you're saying. We didn't necessarily mean they had to present them at the guilt phase. We're just saying at the guilt phase... That's what you're saying today. That's what you've been saying today. My apologies. I mean to say that at the guilt phase, their presentation should have been informed by reasonable investigation. Okay. So... And what would that have meant had it been informed? Then they would have presented a mitigating circumstance in the history of alcoholism. During the guilt phase? Yeah. So you're still talking about what they should have done during the guilt phase? Well... The investigation should have resulted in presenting, not just investigating, but in presenting these witnesses. Well, presenting a more informed presentation of the mitigating circumstance in the history of alcoholism. And then... Through these three witnesses. Or just through their experts. In the first phase. Or just through their experts. You know, the experts rely on none of them, and this is where the state really picks up. And the state says, you know, how often do you ever do these types of investigations without documenting family members? And the experts say, not often. I apologize. I'm not really sure what the clock means right now. Don't worry about the clock. If there are no further questions to be asked... Very cool. All right. Thank you to this panel for being submitted. We do appreciate Mr. VanWinkle and Ms. Frayab. As always, I think both of you did an excellent job. Your briefing and your arguments, obviously there's no case that's more... All cases are important. Very important. But none certainly more important than a capital case. And so we always are particularly grateful when we can always depend on the excellent work from the Western District of Oklahoma's Federal Public Defender's Office and certainly the State Attorney General's Office that has always did an excellent job. And we're appreciative of Mr. Byers for being present in the courtroom to witness the excellent advocacy of the staff. Court is in recess, subject to recall.